UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

EUREKA DIVISION

| | |
|---|---|
| RG ABRAMS INSURANCE, et al.,<br><br>               Plaintiffs,<br><br>       v.<br><br>THE LAW OFFICE OF C.R. ABRAMS, et al.,<br><br>               Defendants. | Case No.  20-cv-01379-JST   (RMI)<br><br>**ORDER**<br><br>Re: Dkt. Nos. 55, 61 |

Now pending before the court are a pair of jointly filed letter briefs setting forth a number of discovery disputes which essentially boil down to Plaintiffs' motion to compel the production of certain discovery. The first letter brief (dkt. 55) was little more than an embodiment of the fact that the Parties had failed to meet and confer in any meaningful fashion, and that they had instead chosen to use the court as a forum for leveling a large number of generalized complaints pertaining to a number of poorly described discovery requests which were not attached to the letter brief. Accordingly, the court conducted a hearing (dkt. 58) at which the Parties were admonished to meet and confer in a *meaningful* manner, following which, they were instructed to jointly file another letter brief (to which they would attach any contested discovery requests); and, the court even doubled the page limit for the subsequent letter brief (dkt. 59) in hopes that the Parties would use the extra pages for the presentation of cogent legal arguments. Those hopes were disappointed in that not only is it clear from the subsequently filed letter brief (dkt. 61) that the Parties have once again failed to meet and confer in good faith, but instead, the Parties have squandered their increased page allowance. In short, the court finds that the currently pending discovery disputes would not exist (or would be greatly reduced and refined) if the Parties had treated the court's

1    meet and confer requirements, as well as the court's professionalism guidelines, as more than

2    hollow formalities. Thus, for reasons described herein, Plaintiffs' motion to compel discovery is

3    granted in part and denied in part.

4                                              **BACKGROUND**

5            Plaintiffs Robin Goltsman and her business, R.G. Abrams Insurance (collectively,

6    "Goltsman"), have sued a series of former business partners and associates, namely, the Law

7    Office of C.R. Abrams, and its proprietor Christopher R. Abrams ("Abrams"), the Rinelli Law

8    Group and its proprietor Sarah Rinelli ("Rinelli"), Jack R. Mills ("Mills"), Robin Armstrong

9    ("Armstrong"), and Cynthia Wooten ("Wooten"). *See* Compl. (dkt. 1) at 2-3. Plaintiffs brought

10   this case under the civil provision of the Computer Fraud and Abuse Act – 18 U.S.C. § 1030(g) –

11   as well as pleading the following claims under state law: fraud and intentional deceit; negligent

12   misrepresentation; intentional and negligent interference with prospective economic advantage;

13   conversion; breach of contract; breach of implied covenant of good faith and fair dealing; breach

14   of fiduciary duty and duty of loyalty; unjust enrichment and promissory estoppel; and, civil

15   conspiracy. *See* Compl. (dkt. 1) at 1.

16           As to the allegations underlying these claims, Goltsman states that she has been in the

17   business of marketing and presenting trust and estate planning seminars since 1987, the purpose of

18   which has been to generate client leads for subsequent sales of legal services and insurance

19   products. *Id*. at 6. As part of these efforts, she claims to have created and maintained a client

20   database "that listed in excess of 35,000 clients and included related client information, including

21   prior purchases and ongoing client needs." *Id*. Further, in addition to this database, Goltsman

22   claims to have "purchased, maintained, and developed unique content using marketing software,"

23   and claims to have kept this unique marketing content and the database on a computer that she

24   claims to have purchased. *Id*. Around the year 2000, Goltsman hired Abrams as an employee of

25   her business under an arrangement where the two would work together to sell trust and insurance

26   services. Goltsman contends that this arrangement involved paying Abrams a certain salary and

27   permitting him "access to Goltsman's business model, employees, computers, database and

28   software." *Id*. at 7. Thereafter, in 2010, Goltsman and Abrams restructured their venture into two

United States District Court
Northern District of California

2

separate companies (RG Abrams Insurance and the C.R. Abrams Law Firm) occupying neighboring office space but with Goltsman reportedly signing Abrams's lease, paying his rent, and paying the salaries of his staff. *Id*. As part of this arrangement, Goltsman claims to have purchased all of the computers and software needed for Abrams to draft trust agreements for their mutual clients; however, "[a]t all times, [] Goltsman's stand-alone marketing computer remained hers alone." *Id*. During this period, the Parties appear to have had a mutually beneficial arrangement wherein Goltsman's seminars would generate leads and produce clients who were in need of both insurance products and legal services. *Id*. at 8.

In 2016, Goltsman and Abrams contemplated a new arrangement in order to effectuate their mutual desire to retire. *Id*. Under this new arrangement, Goltsman would hire Mills as a replacement insurance professional, and Abrams would hire Rinelli as a replacement attorney, such that Mills and Rinelli would take over the business while continuing to make some payments to Goltsman and (presumably) Abrams. *Id*. at 8-9. This new arrangement eventually proved to be less than harmonious, given that in 2019, the Parties' relationship began to deteriorate. While Goltsman was out of town, Abrams took the initiative to execute his own lease agreement for the C.R. Abrams Law Firm (given that his lease was up for renewal), and sometime thereafter, Goltsman and Abrams had a falling out over the financial terms of this new arrangement. *Id*. at 9. Consequently, Goltsman submits that she entered into an oral agreement with Rinelli and Mills to set up a new business offering "prepaid trust legal services" without Abrams. *Id*. Using her database of clients contacts, Goltsman began offering seminars designed to market and sell prepaid trusts with the assistance of Rinelli and Mills. *Id*. As a result, Goltsman claims that Abrams filed a complaint against Rinelli with the California State Bar; and, while the bar complaint was pending (the nature of which is not detailed in the Complaint), Goltsman unsuccessfully attempted to resolve the dispute by "offer[ing] to pay Abrams for access to her own database, but he refused." *Id*. at 9-10.[1]

---

[1] The Complaint does not make it clear why Goltsman would offer to pay Abrams for access to her own database during a period in which it seems to have been in her possession, as illustrated by the statement that "Goltsman used her database containing thousands of client contacts to get the new idea off the ground." *Id*. at 9.

A few months later, in December of 2019, Goltsman reportedly decided to wind down certain parts of her business, due to which she told Armstrong, her secretary, that her employment would soon have to be terminated, except that Goltsman would reportedly pay Armstrong "to pick up her business mail and deliver it to the office" while Goltsman was out of town. *Id*. at 10. Meanwhile, Goltsman reportedly told Wooten, her marketing assistant and seminar conductor, that her employment would continue. *Id*. Similarly, Goltsman also told Rinelli that she would no longer be able to pay her salary, but she told Mills that his employment would continue in that he would be part of the new company. *Id*. Goltsman reportedly told Mills that Rinelli would only be able to come to the office in order to get her personal belongings. *Id*. When Goltsman returned to her office after having been out of town for some unspecified amount of time, she reportedly learned that Abrams, Rinelli, and Mills had formed their own business (without Goltsman), and that Armstrong and Wooten had joined Rinelli's law firm. *Id*. Goltsman then contends that "[i]ndividually or acting together, Defendants took property belonging to Goltsman in order to start their new firm." *Id*. Specifically, the Complaint asserts that "Defendants took the database Goltsman created, Goltsman's marketing software, and her stand-alone marketing computer," and that Armstrong took all client-related mail to Rinelli and Mills, while Wooten diverted Goltsman's business calls to the other Defendants. *Id*. In short, Goltsman contends that Defendants breached their agreements with her regarding revenue sharing, and that in furtherance of this alleged scheme, they stole her computer along with the software and data it contained. *Id*.

At her deposition, Goltsman claimed that "[t]hey took all my computer (sic), all my software, all my work product, all the things I've worked on, created, wrote (sic), researched, paid for for the last 34 years, was all in the computers (sic) and they took it all." *See* Goltsman Depo. Tr. (dkt. 67) at 5. When asked if all of this material and information was in one computer, Goltsman answered in the affirmative. *Id*. When asked what color the computer was, Goltsman responded, "I don't know the color of computers." *Id*. Goltsman was unable to recall any other details about the allegedly stolen computer including its physical description, its manufacturer, when she may have purchased it, how she may have paid for it, whether she has any proof of purchase, or whether she has thus far examined her credit cards records in an effort to ascertain

4

when she may have purchased the allegedly stolen computer. *Id*. at 5-8, 9. When Defense counsel asked Goltsman whether she intended to search her credit card records to see if she could ascertain a date of purchase, Goltsman's counsel objected on grounds of attorney-client communications and instructed Goltsman not to answer the question. *Id*. at 7. Defense counsel then clarified that he was not asking about any conversation between Goltsman and her lawyers, he was simply asking Goltsman if she intended to undertake any further inquiry into her own financial records such as to determine when she may have purchased this allegedly stolen computer; Goltsman's counsel objected again and instructed Goltsman not to answer the question on grounds that Goltsman's knowledge in this regard is somehow attorney work product. *Id*. at 7. In addition to the allegedly stolen computer that Goltsman was unable to describe, she also alleges that Defendants stole all of her office supplies – "everything that was in the office was cleaned out, all the files. They took everything. They left me a few desks." *See* Goltsman Depo. Tr. (dkt. 68-1) at 8. The only identifying or location description that Goltsman was able to provide for the allegedly stolen computer was that before the alleged theft, the computer was reportedly located on Wooten's desk in the marketing room of Goltsman's office. *Id*. at 18. When asked if she knew how much the allegedly stolen computer had cost her, Goltsman merely replied, "[w]hatever computers cost at the time. I don't know." *Id*. at 21. When pressed further, Goltsman could not recall the year in which she purchased the computer, nor where she purchased it, nor whether she picked it up herself, nor whether someone else picked it up for her. *Id*. at 21-22.

As to the value of the allegedly missing computer and its contents, Goltsman was asked (again) how much the allegedly stolen computer cost but her counsel objected by claiming, "vague as to time period," nevertheless Goltsman testified that she believed the value of the computer's contents to be in excess of $3,000,000. *Id*. at 27. Regarding the nature of the allegedly stolen database, Goltsman testified that in 1994 she started logging information pertaining to tens of thousands of clients who had purchased products and services from her – namely, insurance products and trust agreements. *Id*. at 28-29. However, Goltsman was unable to elaborate any further as to the contents of her database – that is, she could not recall what percentage of the persons listed therein had purchased living trusts, or how many of those clients were still alive, or

United States District Court
Northern District of California

1    for what purpose Abrams or Rinelli had accessed that database even when they were authorized to

2    do so. *Id*. at 30-32. In the course of Goltsman's deposition, it became clear that she does not know

3    which, if any, of the Defendants in this case stole her computer because Goltsman claimed that she

4    was out of town and when she returned her office had been emptied – repeatedly asserting, "I

5    don't know what was done behind my back." *Id*. at 8-9. For example, the only reason Goltsman

6    gave for her belief that Defendant Rinelli had some involvement was Goltsman's statement that

7    while Rinelli had been previously requesting access to Goltsman's computer, contemporaneous

8    with the emptying of Goltsman's office Rinelli suddenly stopped asking Goltsman if she could

9    rent or borrow the software templates for producing trust agreements. *Id*. at 9-10. In this same

10   vein, despite the fact that Goltsman's deposition excerpts were not indicative that Abrams and

11   Rinelli had access to her office, Goltsman's only explanation for her belief that her own former

12   employees (Armstrong, Wooten, and Mills) were continuing to use her software was to repeatedly

13   state that if Armstrong, Wooten, or Mills were working for Renelli and Abrams, that they were

14   surely using Goltsman's software. *Id*. at 22. In short, when Goltsman was reportedly out of town,

15   she claims her office was emptied, and she assumes that the culprits must have been Defendants

16   acting in concert with one another.

17                                                    **DISCUSSION**

18           To say that the relationship between these Parties – and between their attorneys – has

19   become acrimonious would be an understatement. The currently pending discovery disputes

20   demonstrate that counsel for both sides have treated the meet and confer requirements of this

21   court's rules as a mere formality. Hence, the Parties have dumped a large amount of unrefined and

22   largely unnecessary disputes onto the court's docket. Both sides have a share of culpability in the

23   creation of the consequential mess that has been left for the court to sort out. Plaintiffs have

24   elected to adopt a scattergun approach to discovery that appears at times to be totally untethered

25   from the substance of the allegations in the operative complaint, and which at other times appears

26   to be wholly unconcerned with the sort of narrowing and tailoring of discovery requests designed

27   to avoid seeking irrelevant or private importation that is clearly outside the scope of permissible

28   discovery. Defendants' counsel, on the other hand, appears to have unilaterally decided that

United States District Court
Northern District of California

Plaintiffs' case is a "sham," which seems to have resulted in an outright refusal to participate in the discovery process to any appreciable degree. A review of the currently pending discovery dispute letter brief imparts this unmistakable impression. Rather than address one another's arguments, the Parties are clearly talking past one another. As described in greater detail below, Plaintiffs appear to have taken a copy-paste approach to addressing Defendants objections to the discovery sought (repeating a series of unhelpful conclusory statements in a rote and mechanical fashion, again and again), while Defendants have strangely taken to asking themselves (or the court) a very large number of unhelpful rhetorical questions coupled with a number of absurd suggestions (such as responding to Plaintiffs' contention that privacy concerns can be alleviated by the entry of a protective order by repeatedly asserting that privacy concerns can also be alleviated by Plaintiffs' dismissal of the case). Suffice it to say, this court expects significantly more by way of professionalism and collegiality from attorneys who practice here.

Before wading into the mess that the Parties' have made of their discovery disputes, the court will take this opportunity to remind counsel about the importance of their obligations regarding this court's meet and confer requirements, as well as the court's professionalism guidelines. Initially, the court will note that, from here on out, "[t]he Court will not entertain a request or a motion to resolve a disclosure or discovery dispute unless, pursuant to Fed. R. Civ. P. 37, counsel have previously conferred for the purpose of attempting to resolve all disputed issues." Civ. L.R. 37-1(a). In this regard, it is incumbent on counsel for the Parties "to communicate directly and discuss **in good faith** the issue(s) required under the particular Rule or order . . . The mere sending of a written, electronic, or voice-mail communication, [] does not satisfy a requirement . . . [instead] this requirement can be satisfied only through direct dialogue and discussion – either in a face to face meeting or in a telephone conversation." Civ. L.R. 1-5(n) (emphasis added). This requirement is not a meaningless formality (as the Parties appear to have treated it), nor is it optional; instead, the purpose of a meet and confer requirement is for the Parties to engage in a _meaningful_ dialogue about their respective positions on disputed issues to see whether they can resolve (or at least refine) the disputes without court intervention, saving time and money for the litigants as well as the court system. *See Fireman's Fund Ins. Co. v.*

7

*Hartford Fire Ins. Co.*, 2013 U.S. Dist. LEXIS 147020, at *9 (N.D. Cal. Sep. 30, 2013) ("The purpose of the meet and confer requirement is to ensure that the particular relief requested in a motion, in fact, requires judicial intervention.") *see also Wong v. Astrue*, 2008 U.S. Dist. LEXIS 111133, 2008 WL 4167507, at *2 (N.D. Cal. 2008) ("The purpose of the [meet and confer] requirement is to encourage settlement, resolve disputes which need not involve the Court, and avoid unnecessary litigation, thus saving the Parties', the Court's, and the taxpayers' limited time, money, and resources."); *California v. Iipay Nation of Santa Ysabel*, 2015 U.S. Dist. LEXIS 67415, 2015 WL 2449527, at *6 (S.D. Cal. May 22, 2015) ("A purpose of a meet and confer requirement is to resolve issues without the need for further action."); *Eusse v. Vitela*, Case No.: 3:13-cv-00916-BEN-NLS, 2015 U.S. Dist. LEXIS 167660, 2015 WL 9008634, at *3 (S.D. Cal. Dec. 14, 2015) ("This process, when successful, 'obviates the need for unnecessary motion practice, which, in turn, conserves both the Court's and the parties' resources.'") (internal citation omitted). Thus, in order to effectuate this purpose, "parties must 'treat the informal negotiation process as a substitute for, and not simply a formal prerequisite to, judicial review of discovery disputes.'" *U-Haul Co. of Nevada v. Gregory J. Kamer, Ltd.*, 2013 U.S. Dist. LEXIS 132795, 2013 WL 5278523, at *2 (D. Nev. Sept. 17, 2013) (internal citation omitted).

Regarding professionalism, the court will remind counsel of the expectation that "[e]very member of the bar of this Court and any attorney permitted to practice in this court . . . [shall] [p]ractice with the honesty, care, and decorum required for the fair and efficient administration of justice." *See* Civil L.R. 11-4(a)(4). Further, "[a] lawyer should at all times be civil, courteous, and accurate in communicating with opponents or adversaries, whether in writing or orally."[2] Lastly, and most importantly for present purposes, "[w]ritten materials submitted to the court should always be factual and concise, accurately state current law, and fairly represent the parties' positions without unfairly attacking the opposing party or opposing counsel."[3]

---

[2] *See* Guidelines for Professional Conduct in the United States District Court for the Northern District of California at § 8. (available at: https://www.cand.uscourts.gov/forms/guidelines-for-professional-conduct/)

[3] *See id*. at § 7.

United States District Court
Northern District of California

1

2

3

4

5

6

7

8

9

10

11

United States District Court
Northern District of California

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

In other words, the inherently adversarial nature of litigation does not mean that Parties or their counsel have license to take a scorched earth approach to resisting discovery, or to take a scattergun approach to propounding discovery, or to litter the court's docket with an inordinate number of absurd rhetorical questions that achieve nothing other than rendering the court's decision-making task more difficult. As described below, the conduct of counsel for both sides in this case, combined with their failure to meet and confer in any meaningful fashion, has rendered what should be a reasonably straightforward period of discovery in what is an exceedingly simple case into an unnecessarily convoluted mess due to the fact that the court finds itself faced with "two experienced senior litigators surrounded by the usual support troops [who] went after each other hammer and tongs from the first day of the litigation []." *See Zink Commc'ns v. Elliott*, 141 F.R.D. 406, 408 (S.D.N.Y. 1992) (denying request for sanctions). In any event, the court is hopeful that, given this admonition, counsel will proceed from this point forward with a measure of decorum and in the appropriate spirit of cooperation and collegiality embodied in this court's rules and professionalism guidelines.

Plaintiffs' portion of the letter brief begins with a "preliminary statement" in which Plaintiffs generally complain about Defendants' refusal to produce "even a single document" in response to Plaintiffs' 250 requests for production. *See* Supp. Ltr. Br. (dkt. 61) at 1. Defendants' "preliminary statement" contends that Plaintiffs' discovery "was not propounded in good faith . . . [and] is a disguised effort at extortion . . . [t]he idea being; if I can get your financial records and your privileged personal and private documents including attorney-client files; then maybe you'll pay me some money." *Id*. at 1-2. While the court sees this as ill-tempered hyperbole, it is also tantamount to accusing Plaintiff Goltsman and her counsel of borderline criminal conduct, something which the court believes is uncalled for and serves as an example of an unnecessary deviation from the standards of professionalism cited above. Next, the Parties waste some time and effort arguing about whether or not Defendants have in fact lodged any blanket or general objections. *Id*. at 2.

The court will now turn to the individually specified discovery disputes that have actually been detailed and argued by the Parties. First, Plaintiffs move to compel Abrams's response to

RFP No. 4 which seeks all documents relating to money due, owed, or payable to Goltsman from Abrams or his law firm. *Id*. at 2. Abrams contends that he owes Plaintiff nothing and that there are no documents responsive to this request. *Id*. at 3. Accordingly, Goltsman's request to compel documents which Abrams maintains do not exist is **DENIED**. Plaintiffs next seek to compel Abrams (RFP No. 10) and Rinelli (RFP No. 2) to produce their "complete client database[s]." *Id*. at 3, n. 11. Defendants object by way of a rhetorical question coupled with a measure of hyperbole, all of which boil down to the contention that these requests are overly broad in that they seek information that is potentially far beyond the scope of permissible discovery in this case. *Id*. at 4. In other words, assuming the truth of the allegations in Plaintiffs' complaint, and assuming the truth of the entirety of Goltsman's deposition testimony, the phrasing of these requests casts a far wider net than conceivably necessary and proportional to the needs of this case. Plaintiffs have not requested the list of clients that Abrams and Rinelli had in common with Goltsman, or the list of clients that she claims they allegedly pillaged from her undescribed and poorly identified computer – instead Goltsman simply demands to receive the entire "database" of any and all clients that have ever retained Rinelli or Abrams. These requests are grossly overbroad in that they seek to capture a potentially large volume of information that may very well have nothing to do with this case at all (let alone implicating the privacy rights of unrelated persons and entities); thus, these requests are **DENIED**.

Next, in RFP No. 17, Goltsman seeks to compel the production of a trust template that Goltsman purchased in 1994 and which she modified and updated throughout the years with the assistance of various attorneys (including Abrams). *Id*. at 4. Goltsman contends that this trust template included the incorporation of certain cartoon images from the fictional Flintstone family in order to colorfully illustrate exemplar trust grantors and beneficiaries, which the Parties would use as an explanatory tool when meeting with prospective clients. *Id*. Specifically, Plaintiffs seek the production of "The Flintstone Trust" both "in its present form and [in] its form as of December 1, 2019." *Id*. Defendant Abrams, in response, does not state whether or not he is in possession of such a document. *See id*. at 5. Instead, he contends that any such modifications made to that exemplar trust template "would be their work product and their business secrets and their

United States District Court
Northern District of California

1    proprietary information." *Id*. Defendant Abrams then launches into the following soliloquy: "A

2    complete copy of – of what? If such a document ever existed, a copy before it was modified? After

3    it was modified? In 1994? In 2004? Is this some sort of a blank form? If Goltsman purchased a

4    template – then it's not hers. She bought it from somebody else and it belongs to them. She just

5    obtained a photocopy – probably illegally." *Id*. Rather than claiming that the document request is

6    legally flawed and explaining why that might be the case, Defendants have squandered their

7    opportunity to argue against the compelled production of "The Flintstone Trust" by way of what

8    must regrettably be described as a cartoonish diatribe. Because RFP No. 17 seeks the production

9    of a document template that falls within the scope of permissible discovery, and because

10   Defendants have failed to convince this court that the request is either impermissibly vague,

11   overbroad, irrelevant, or otherwise not subject to discovery, Plaintiffs' motion to compel the

12   production of the template for "The Flintstone Trust" in its present form and as it existed on

13   December 1, 2019, is **GRANTED** because once a moving party establishes that the information

14   sought through a motion to compel is within the scope of permissible discovery, the burden shifts

15   to the party resisting discovery to show why the discovery is irrelevant, overly broad, or unduly

16   burdensome or oppressive, and thus should not be permitted – and Defendants' diatribe failed to

17   satisfy that burden. *See* e.g., *Proofpoint, Inc. v. Vade Secure, Inc.*, No. 19-cv-04238-MMC (RMI),

18   2020 U.S. Dist. LEXIS 211706, at *13 (N.D. Cal. Nov. 11, 2020); *Colaco v. ASIC Advantage

19   Simplified Pension Plan*, 301 F.R.D. 431, 434 (N.D. Cal. 2014); and, *Dominguez v.

20   Schwarzenegger*, No. C 09-2306 CW (JL), 2010 U.S. Dist. LEXIS 94549, at *10 (N.D. Cal. Aug.

21   25, 2010).

22          Next, in RFP Nos. 27 through 29 Plaintiffs seek all communications and documents

23   relating to Abrams's first, second, and third counterclaims against Plaintiffs for breach of written

24   contract, battery, and nuisance. *Id*. at 5. Defendants correctly contend that the broad phrasing of

25   these requests (specifically, the use of the phrase "related to") renders them overbroad and vague;

26   however, it appears that there is a promissory note that is contemplated by one or more of these

27   requests which Defendants have withheld on grounds that they claim Plaintiffs already have a

28   copy. *Id*. Due to the unnecessarily broad phrasing of these requests (which could unnecessarily

11

capture a great deal of correspondence and documentation executed between Abrams and his counsel in defending this case, and which would unnecessarily burden Defendants with producing a larger privilege log than necessary) RFP Nos. 27 through 29 are **GRANTED in part** in that Defendants are **ORDERED** to tender a copy of the promissory note in question; these requests are otherwise **DENIED**. However, the Parties are **ORDERED** to meet and confer forthwith in a meaningful and good faith effort to negotiate a narrowing of these requests such that they may be tailored to more efficiently identify information that is within the permissible scope of discovery and proportional to the needs of the case.

In RFP Nos. 31 through 34, Plaintiffs seeks all communications and documents relating to Defendants' roles and responsibilities in the Parties' business ventures together, the sharing of money or financial benefit between the Parties, and the manner in which Goltsman would be compensated for efforts relating to any business or venture with the Defendants. *Id*. at 5-6. Defendant submits that these requests are overly broad, to which Plaintiffs reply by seeking to narrow the temporal scope such as to limit their request from 2015 to the present. *Id*. at 6. As for Defendants' concerns about privacy and relevance issues arising from Plaintiffs' broadly phrased requests, where Plaintiffs contend that such concerns can be alleviated through the execution of a protective order, Defendants reply with the laughable suggestion that "[t]he truth is that the matter could also be addressed by plaintiff dismissing this lawsuit." *Id*. Defendants then candidly indicate their intention to obstruct discovery by proclaiming that "[t]his case needs very little if anything." *Id*. Given that Plaintiffs' are still narrowing their discovery requests *within* their motion to compel, there can be little room to dispute the fact that the Parties have not engaged one another in any meaningful effort to meet and confer in good faith in order to resolve or narrow their disputes before dumping their disagreements onto the court's doorstep. Accordingly, because it is clear that the Parties have not engaged in *meaningful* meet and confer efforts, and because RFP Nos. 31 through 34 are sloppily drafted and suffer from being both vague and overbroad, those requests are **DENIED**. The Parties are **ORDERED** to meet and confer forthwith in a meaningful and good faith effort to negotiate a narrowing of these requests such that they may be tailored to capturing only information that is within the permissible scope of discovery and proportional to the needs of

the case. Thereafter, if any dispute remains as to these issues, the Parties are **ORDERED** to jointly

file a discovery dispute letter brief (no longer than 5 pages in length and with no footnotes) in

which Plaintiffs clearly explain the relevance of each request to an identified claim in the

operative complaint *without* using the mechanical and robotic copy-paste method that dominates

Plaintiffs' portion of this letter brief; and, Defendants will clearly set forth a cogent argument on

their objection to the discovery sought while avoiding rhetorical questions or the sort of hyperbole

described herein.

      Regarding RFP No. 35, the Parties engage in a similarly frustrating back and forth.

Through this request, Plaintiffs want the court to compel Abrams to produce all documents and

communications relating to Plaintiffs' clients or client list. *Id*. at 6. Confusingly, Plaintiffs then

state that Abrams has responded that no such documents are known to exist, however, the notion

that no such documents exist is *not* included in the litany of contentions advanced by Abrams. *See

id*. at 6-7. Instead, Abrams asks yet another series of unhelpful rhetorical questions, and contends

again that rather than addressing any privacy concerns by way of a stipulated protective order,

"[t]he truth is that any privacy concerns can be addressed by dismissal of her lawsuit." *Id*. at 7.

Meanwhile, Gotlsman once again amends and modifies RFP No. 35 *within* her motion to compel

as such: "the request is hereby amended to seek[] the client database alleged in the Complaint to

have been taken from Goltsman by Defendants without Goltsman's consent – and not documents

'related' to that database." *Id*. None of Abrams's barrage of rhetorical questions or hyperbole

address this modification. As was the case above, because Plaintiffs have modified their discovery

request within the motion to compel itself, and because Defendants have not addressed that

modification, and because the on-the-fly modification is clearly indicative of a failure to meet and

confer in any meaningful fashion on the original request, let alone in its modified form, that

request is **DENIED**. The Parties are herewith **ORDERED** to meet and confer forthwith in a

meaningful and good faith effort regarding RFP 35 in its now-modified form (which now appears

to the court to be sufficiently narrow such as to capture relevant information). Thereafter, if any

dispute remains as to this issue, the Parties are **ORDERED** to include it in the jointly filed

discovery dispute letter brief described above (no longer than 5 pages in length and with no

footnotes).

In RFP Nos. 36 through 41, Plaintiffs seek an order compelling Abrams to produce "documents and communications relating to (36) any business ventures between Defendants; (37-38) Abrams' and Defendants' roles and responsibilities in any business ventures between Defendants; (39-40) compensation and the sharing of money and financial benefit with Abrams from any Defendant; and (41) the value of Plaintiff's efforts, business, client list or seminars." *Id.* at 7. Plaintiffs contend that this material is "critical to Plaintiffs' claims since they have the tendency to demonstrate Defendants conspired to copy Goltsman's business model / proprietary business materials (including client database(s), forms and marketing materials); intercept Goltsman's mail and client calls; and refuse to continue paying Goltsman seminar proceeds and insurance commissions at varying rates over time." *Id.* Abrams submits that these requests are vague and overbroad, as well as reiterating that a great deal of irrelevant and privileged materials could be construed to come within the ambit of these requests, but that rather than the execution of a protective order, [t]his could also be addressed by plaintiff through dismissal of the case." *Id.* at 7-8. Once again, the court finds that Plaintiffs' requests have been drafted far too broadly, they are limited neither in temporal scope, nor in terms of subject matter – the requests seem oblivious to the possibility that these Defendants may very well have business dealings that are quite independent of Plaintiffs' concerns in this case. If Plaintiff wishes to conduct discovery that may have "a tendency to demonstrate that Defendants conspired" against her business and personal interests in the manner described in her complaint, she should first significantly narrow these requests to that end, and then meaningfully meet and confer with Defendants about the narrowed requests before seeking court intervention. Accordingly, Plaintiffs' request to compel production of RFP Nos. 36 through 41 is **DENIED**.

In RPF No. 4, Plaintiffs asks the court to compel Mills to "produce documents showing all sources of his income for the last five years." *Id.* at 8. Plaintiffs submit that such a wildly broad phrasing is necessary because "[a]t the heart of Plaintiffs' claims is that Mills agreed to pay Goltsman insurance proceeds at varying rates during her retirement in exchange for, *inter alia*, Mills' and Defendants' continued access to her extensive and valuable client database." *Id.*

United States District Court
Northern District of California

14

Defendant Mills's response is largely dominated by asking six rhetorical questions of little import, as well as reiterating, yet again, that a better way of addressing privacy concerns (rather than through the entry of a protective order) is the dismissal of Plaintiffs' case. *Id*. at 8. The gist of Mills's rhetorical questions is that this request, like those discussed above, is grossly overbroad. If Plaintiffs wish to receive discovery about Mills's alleged agreement to pay Goltsman certain portions of certain types of insurance commissions in exchange for his use of her client lists, or discovery supporting Mills's counterclaims that Plaintiff failed to pay Mills his overtime wages, asking Mills to produce documents showing *all* sources of his income for the last five years is not the way to go about that. Once again, because the request is grossly overbroad, the request to compel Mills to respond to RFP No. 4 is **DENIED**.

In RFP Nos. 27 through 33, Plaintiffs seek an order compelling Mills "to produce communications and documents relating to his first, second, third, fourth, fifth, sixth and sevenths counterclaims, respectively, against Plaintiffs." *Id*. Defendant responds (for the second time in this letter brief) with an assertion that Plaintiffs improperly served those demands on "defendant Mills" instead of "counterclaimant Mills." *Id*. at 8-9. This assertion merits no discussion whatsoever. That said, Mills objects to these requests because of the contention that they "could include thousands of documents which are either privileged or in the possession of plaintiff because she generated them to begin with." *Id*. at 9. Due to the unnecessarily broad phrasing of these requests (which could unnecessarily capture a great deal of correspondence and documentation executed between Mills and his counsel in defending this case, and which would unnecessarily burden Defendants with producing a larger privilege log than necessary) RFP Nos. 27 through 33 are **DENIED**. However, the Parties are **ORDERED** to meet and confer forthwith in a meaningful and good faith effort to negotiate a narrowing of these requests such that they may be tailored to more efficiently identify information that is within the permissible scope of discovery and proportional to the needs of the case.

Pertaining to Defendant Wooten, RFP Nos. 8 through 16 seeks all communications and documents related to Wooten's counterclaims against Plaintiffs. *Id*. at 9. Wooten's objections are virtually the same as those presented in opposition of the similar requests propounded to Mills in

United States District Court
Northern District of California

United States District Court
Northern District of California

1   RFP Nos. 37 through 33. *See id.* Thus, for the same reasons articulated above (i.e., the use of the

2   phrase "related to" would unnecessarily capture a great deal of correspondence and documentation

3   executed between Wooten and her counsel in defending this case, and which would unnecessarily

4   burden Defendants with producing a larger privilege log than necessary), Plaintiffs' request to

5   compel Wooten's production of documents responsive to RFP Nos. 8 through 6 is **DENIED**.

6   However, the Parties are **ORDERED** to meet and confer forthwith in a meaningful and good faith

7   effort such as to narrow these requests as described above.

8        In RFP No. 17, Plaintiff seeks to compel Wooten to produce and tender a mirror image of

9   the hard drive of Plaintiffs' allegedly stolen marketing computer. *Id.* at 9. Defendants' response is

10  obfuscated by various rhetorical questions and abstract hyperbole – while Defendants insinuate

11  and imply that they do not have that computer in their possession, they do not clearly say as much.

12  Accordingly, any ruling on request is **DEFERRED** and the Parties are **ORDERED** to meet and

13  confer in good faith regarding this request; and, if it is Defendants' position that they do not have

14  possession of the computer referred to in Plaintiffs' complaint, Defendants shall say so in a clear

15  manner and without equivocation or obfuscation. If any dispute remains after the Parties meet and

16  confer regarding this issue, the Parties shall include the refined and narrowed issue in the

17  subsequent letter brief described above. In other words, it is not possible for the court to conclude

18  that Defendants' have stated that they do not possess Plaintiffs' "stand-alone marketing computer"

19  simply because Defendants *only* make a point of hammering on Plaintiffs' inability to describe the

20  computer in question at her deposition. Either one of these Defendants is in possession of the

21  computer mentioned by Plaintiffs' Complaint or they are not. However, through Defendants' use

22  of deflection and obfuscation, the court is unable to discern whether Defendants are claiming not

23  to have that computer in question, or whether they are claiming that the computer is theirs and

24  does not belong to Plaintiff, or whether they are using word games to hide behind the fact that

25  Plaintiff is unable to clearly identify the color or purchase date of the allegedly stolen computer. If

26  after meeting and conferring the Parties find themselves still disputing Plaintiffs' entitlement to a

27  ruling on RFP No. 17 as addressed to Wooten, Defendants' are **ORDERED** to take a clear and

28  unequivocal position in any subsequently filed letter brief pertaining to this issue.

1    Lastly, the court finds that the Parties' dispute about Defendants' Rule 26 disclosures is

2    similarly the product of a failure to meaningfully meet and confer prior to involving the court in

3    their discovery disputes. Whereas Plaintiffs contends that Defendants have failed to disclose a

4    computation of each category of damages claimed, or to make available for inspection the

5    documents and other evidentiary material on which each computation is based, Defendants

6    contend (in the midst of another series of maddening rhetorical questions) that "Defendants are not

7    claiming any damages." *Id*. at 10. Accordingly, because Defendants state that they "are not

8    claiming any damages," Plaintiffs' request to compel the disclosure of a "computation" of the "no

9    damages" which Defendants seek is **DENIED**.

**CONCLUSION**

11    In closing, the court will sternly admonish the Parties, as well as their counsel, that if any

12    subsequently filed discovery dispute letter brief in this case suffers from any of the defects and

13    deficiencies described herein – such as to once again constitute such a waste of judicial time and

14    resources – the responsible Parties, or their attorneys, should expect to find themselves venturing

15    to explain why they should not be appropriately sanctioned.

16    **IT IS SO ORDERED.**

17    Dated: December 28, 2020

ROBERT M. ILLMAN
United States Magistrate Judge